**Marie HARTNETT, Plaintiff,**

v.

**Margaret M. HECKLER, Secretary of Health and Human Services, Defendant.**

**No. 85 C 5118.**

United States District Court, N.D. Illinois, E.D.

Jan. 3, 1986.

Robert M. Hodge, Chicago, Ill., for plaintiff.

Anton R. Valukas, U.S. Atty., Elizabeth Stein, Asst. U.S. Atty., Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Marie Hartnett ("Hartnett") seeks judicial review of a final decision by Secretary of Health and Human Services Margaret Heckler ("Secretary") denying Hartnett disability insurance benefits. Hartnett initially applied for benefits under Social Security Act ("Act") §§ 216(i) and 223, 42 U.S.C. §§ 416(i) and 423.[1] After a June 19, 1984 evidentiary hearing (the "Hearing"), Administrative Law Judge Russell S. Barone ("ALJ Barone" or simply the "ALJ") denied Hartnett's application January 2, 1985. Hartnett then exhausted her administrative remedies in proper sequence (a process that resulted in the ALJ's decision becoming Secretary's) and brought this action against Secretary pursuant to Section 405(g).

As invariably occurs in these actions, which come to this Court on the administrative record and a decision by Secretary, the parties have filed cross-motions for summary judgment.[2] For the reasons stated in

---

1. All further statutory citations in this opinion will take the form "Section—," following the numbering in Title 42 rather than the Act's internal numbering. In citing to the relevant regulations:

    1. Where the reference is to the medical-vocational guidelines found at 20 C.F.R. Part 404 Subpart P, Appendix 2, this opinion will speak of such guidelines collectively as the "Grid" and individually as "Grid § —."

    2. Where the reference is to any other provision of 20 C.F.R. Part 404, this opinion will omit that part of the citation entirely and will speak simply of "Reg. § —" (listing only the portion of the citation after the decimal point that follows "404").

2. Only one variation on the usual pattern presented itself here: Hartnett's counsel elected not to file a reply memorandum, leaving the matter to be decided on two briefs rather than three. As might be guessed from the length of this opinion (forced by the issues to be discussed), when contrasted with the brevity of the parties' submissions (a five-page legal discussion in Hartnett's memorandum and some six pages—much of it purely evidentiary—in Secretary's), the burden has improperly been shifted from the litigants (where it belongs) to this Court's law clerk, C. Steven Tomashefsky, Esq. (where it does not). Though he has—unsurprisingly—responded to the need, that should never have happened. Clearly the litigation system really breaks down when the major work has to

this memorandum opinion and order, Hartnett's motion is denied and Secretary's is granted.

## Facts

Hartnett, who was 53½ years old at the time of the Hearing, had carried her formal education through two years of high school (R. 50). Beginning in 1969 she was employed by National Can Company ("National Can"), where she became a "double seamer operator" in 1975 (R. 52). That job involved running a machine that put tops and bottoms on cans, and it required constant bending and lifting of weights up to 40 pounds (R. 53). Wherever she could, however, Hartnett bid for work as an assistant quality-control inspector. Consequently she did such work for six to nine months each year since 1976, taking cans apart with nippers and measuring them with gauges and micrometers (R. 55–59). On that job Hartnett did little lifting or standing: Occasionally she lifted gauges or boxes of empty cans weighing up to 15 pounds (R. 62–63). Once or twice a year (during slow production periods) she was called on to clean the can-manufacturing machines, a task that was not part of her double-seamer job or quality-control work. Machine cleaning required some crawling on hands and knees (R. 65–66).

Hartnett has had three spinal laminectomies, the first two in 1972 and 1973 and the third in 1982 (R. 69, 124). Her 1982 operation was necessitated by an on-the-job injury late in 1981 (R. 69). Though she returned to work in August 1982 she was laid off during a January 1983 cutback at her plant, in part because she lacked seniority and in part because National Can did not feel she had the physical ability to do quality-control work full time (R. 69–71).

After her layoff, Hartnett applied for state unemployment benefits. As part of that application, she stated she was "ready, willing and able" to take a job (R. 72).

National Can took the position before the Illinois Department of Labor that Hartnett was physically unable to return to her former work (R. 74, 247). Her application for unemployment benefits was successful, based on a showing she had diligently sought a job from March to September 1984 (R. 247). At the time of the Hearing, she was taking a vocational class in horticulture eight hours each day (R. 79). She does her own driving, housework, cooking and shopping (R. 49, 80–81).

Hartnett complains of low back pain radiating up to her shoulders and down to her legs (R. 88). She cannot move the toes of her left foot (R. 97), and she occasionally feels pain while braking her car (R. 67). Formerly she took various medications, including Darvon, Motrin, Medrol and steroids, but she experienced adverse side effects from those and now takes only aspirin (R. 83–84).

Medical evidence at the time of the Hearing offered the following picture:

1. Following Hartnett's discharge from hospital after her third laminectomy, Dr. Kling's March 19, 1982 Discharge Summary found her progress to be "relatively satisfactory considering the long standing history of difficulty," noting she was experiencing "some mild residual pain." She was directed to restrict her activity "with no lifting, no climbing stairs, outside activity or excess exercise" (R. 177).

2. On January 27, 1983 Hartnett's treating physician Dr. Soriano supplied her with a note saying (R. 213):

> This is to certify that Marie Hartnett is still under my care at this time. She is on light duty and is to do no bending and only occasional lifting up to ten pounds.

3. Dr. Soriano's April 28, 1983 note advised Hartnett (R. 214):

be performed by a resource in short supply (a law clerk with responsibility for half this Court's calendar) rather than by the lawyers who have responsibility for just the case at issue

(and who are able to control their caseloads by accepting or rejecting cases, as this Court and its clerks are not).

against consistent bending or lifting. It is also advised for the patient to have a weight limitation of 10 pounds.

4. Dr. Soriano's report of a September 29, 1983 examination (R. 197–99) showed mild paralysis of the left-foot dorsiflexor muscle, with overall residual capacity for pushing and pulling, gross manipulation, fine manipulation and lifting 10 to 20 pounds. No gait abnormalities were observed, but there was "minimal" atrophy of the left calf. "Pins & needles" pains were found in Hartnett's legs, as well as decreased left ankle reflexes. Overall her condition was "improving," and a return to full weight bearing was expected by October 1983.

5. After a May 17, 1984 examination (R. 219–21) Dr. Soriano described Hartnett's stance, gait and coordination of extremities as "fair." Her ambulation was "somewhat stiff but no gross abnormalities." Cervical spine flexion and extension were "full range" and rotation "ok," while lumbar spine flexion was 80%, extension 90% and rotation 60%. Her condition was "stable." Dr. Soriano suggested she could lift up to 15 pounds and walk or stand six to eight hours per day with "occasional sitting."

To supplement that information, the ALJ solicited post-Hearing evidence from vocational expert Dr. Sharon Geist. ALJ Barone's June 27, 1984 letter to Dr. Geist (R. 222–23):

(a) described Hartnett's job as an assistant quality control inspector in the same terms Hartnett had herself used at the Hearing (see R. 55–65); and

(b) asked Dr. Geist to assume Hartnett[3] could lift, carry, push or pull up to 15 pounds, could stand or walk six to

eight hours per day (with occasional sitting) and could not do any work requiring consistent bending or lifting (R. 222). That set of limitations corresponds with those set out in Dr. Soriano's May 17, 1984 examination report.

Based on the ALJ's description, the vocational expert's August 8, 1984 letter response concluded (R. 224):

1. Hartnett's work at National Can was "semi-skilled."

2. Hartnett had become skilled in the use of small hand tools and fine measuring devices.

3. Those skills were transferable to jobs in other industries.

4. There were jobs "available in abundance in various manufacturing industries in the local Chicago area" that could be performed by a person with Hartnett's skills and exertional limitations.[4]

But Dr. Geist also qualified that last conclusion (R. 224–25):

However, [those jobs] are usually reserved for persons who have obtained some degree of seniority within a company after doing more physically stressful work at an entry level. This might make placement more difficult.

ALJ Barone gave Hartnett's counsel the opportunity to comment on Dr. Geist's findings. Counsel's October 12, 1984 letter reply (R. 238–39) argued:

1. Dr. Geist's qualifying statement made her finding as to the availability of jobs for Hartnett "ambiguous," in the sense that though such jobs were theoretically available Hartnett probably could not get one.

2. Because Hartnett was past 53 years old at the Hearing, she would like-

---

3. ALJ Barone's letter does not mention Hartnett by name but refers to a "hypothetical person" answering to Hartnett's description. Hartnett neither (1) challenges the practice of an ALJ's using post-hearing questions to, and answers from, a vocational expert (see R. 38) (cf. *Tom v. Heckler*, 779 F.2d 1250, 1252 n. 2 (7th Cir.1985), referring to the process difficulties inherent in that procedure but treating the issue as waived *if not raised by counsel*) nor (2) disputes the ALJ's characterization of Hartnett's physical condition and past work in his letter. Indeed

(as this opinion later discusses) she relies on the vocational expert's response.

4. Dr. Geist listed the following job titles and industries (R. 224):

| Job Title | Industry |
| --- | --- |
| Quality control inspector | Garment-light |
| Quality control clerk | Bakery products-light |
| Quality control coordinator | Drug prep[a]ration-sedentary |
| Quality control technician | Photo finishing-light |
| Quality control tester | Hosiery-light |
| Quality control tester | Paper goods-light |

ly be past 55—what the Grid calls "advanced age" (Reg. § 1563(d))—by the time she became familiar enough with a new industry to work in quality control. Thus she should be considered as being of "advanced age" even in the current use of the Grid.

### Administrative Findings

ALJ Barone found Hartnett (R. 20):

has a severe impairment which considerably affects her ability to perform numerous basic exertional work functions, including repeated bending and stooping, heavy lifting, climbing, and other strenuous job functions.

That finding led to a conclusion Hartnett was unable to perform her past relevant work as a double seamer operator (R. 24).

Once a claimant has demonstrated an impairment of sufficient severity to preclude the type of work he or she previously performed, the burden shifts to Secretary to show the claimant (Section 423(d)(2)(A)):

cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.

See also *Whitney v. Schweiker*, 695 F.2d 784, 786 (7th Cir.1982) (discussing burden shift to Secretary).

5. "Light work" is a term of art, defined by Reg. § 1567(b) as involving lifting of no more than 20 pounds at a time, with frequent lifting or carrying of objects weighing up to 10 pounds. Further, the regulation specifies that even if a job requires lifting of only slight weights, a job will be classified as "light" (rather than the lowest category, "sedentary") if it requires a good deal of walking or standing, or if it involves sitting most of the time with some pushing and pulling of arm or leg controls.

6. Reg. § 1563(c) defines "closely approaching advanced age" as ages 50–54. ALJ Barone mistakenly put Hartnett's age at 50 (in fact she was 53½ at the time of the Hearing). Though the age given was thus erroneous, the ALJ's classification of Hartnett's age was not.

In meeting that burden an ALJ typically looks to the Grid's guidelines, which balance a claimant's physical limitations against his or her age, education and work experience to determine whether a significant number of jobs exist in the national economy for a person with the claimant's characteristics. *Smith v. Schweiker*, 735 F.2d 267, 270 (7th Cir.1984). ALJs may also base that determination on other evidence, including assessment by a vocational expert (Reg. § 1566(e)).

Here ALJ Barone made these determinations relevant to the Grid (R. 24):

1. Based on Dr. Soriano's September 29, 1983 report, Hartnett had the residual functional capacity to perform "virtually the full range of light work."[5]

2. Hartnett was what the Grid terms "approaching advanced age" (Reg. § 1563(c)).[6]

3. Hartnett had what the Grid calls a "limited education" (Reg. § 1564(b)(3)) but was literate in English.

4. Hartnett was able to do "semi-skilled work" (Reg. § 1568(b)), and the skills she acquired at National Can—the ability to use small hand tools and fine measuring devices—were applicable to other sorts of jobs.[7]

With those findings as a predicate, the ALJ held the Grid directed a finding Hartnett was "not disabled," whether or not her skills were considered transferable (R. 24 findings 10, 11).[8]

7. That determination speaks to what the Grid considers "transferability" (Reg. § 1568(d)(1)) of skills:

We consider you to have skills that can be used in other jobs, when the skilled or semi-skilled work activities you did in past work can be used to meet the requirements of skilled or semi-skilled work activities of other jobs or kinds of work. This depends largely on the similarity of occupationally significant work activities among different jobs.

8. Finding 10 states:

10. The claimant has acquired work skills, such as the ability to use small hand tools and fine measuring devices which she demonstrated in past work. Considering her residual

That decision, which has become Secretary's, must be affirmed by this Court unless it is not supported by substantial evidence or it reflects the application of incorrect legal standards (Section 405(g)). *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938), has defined "substantial evidence" as:

> such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

### Hartnett's Contentions

Hartnett advances four arguments for reversing ALJ Barone's decision. Her Mem. 1 says the ALJ:

1. mischaracterized the nature of her past work and her reasons for leaving it;

2. erred in finding her receipt of unemployment benefits was an admission she could do any type of substantial gainful activity;

3. incorrectly used the Grid after having obtained evidence from a vocational expert; and

4. erred in finding the vocational expert's report provided a basis for holding Hartnett's skills were transferable to a significant number of jobs in the national economy.

None of those contentions, either singly or in combination, carries the day.

### 1. Hartnett's Past Work

■ Reduced to syllogistic form, Hartnett's first argument amounts to this:

> functional capacity, these skills can be applied to meet the requirements of semi-skilled work activities of other work which exists in significant numbers in the national economy (20 CFR 404.1568).
> Nothing in the "transferability" definition (see n. 7) requires an ALJ to take residual functional capacity into account. Indeed, to do so tends to blur distinctions among the various factors the Grid employs. Moreover, the ALJ's finding that Hartnett's skills are applicable to other work "which exists in significant numbers in the national economy" is conclusory of the very result the application of the Grid's separate factors is designed to reach. But while Finding 10 is inartful in both those

1. National Can's assistant quality control inspector job was "light" work.

2. Hartnett was let go because she could not do that job.

3. Therefore Hartnett is unable to do a full range of light work.

That argument simply misreads the facts. Hartnett herself testified there were layoffs due to a cutback in staff at National Can (R. 69). Further, her attorney asserted at the Hearing that National Can had added heavier duties to the quality-control job, and *that* made it impossible for Hartnett to perform (R. 71, 75, and see R. 101).[9] Under those circumstances, Hartnett's layoff is hardly probative of her ability to do "light work" as that term is used in Social Security proceedings (see n. 5).

In any event, the ALJ did not rest on Hartnett's description of her past work. Instead he relied strongly on the reports of her own treating physician: His description of her limitations in the letter to the vocational expert recited Dr. Soriano's most recent report almost verbatim.

### 2. Hartnett's Unemployment Benefits

■ Hartnett's second argument is similarly a blind alley. In her application for state unemployment benefits, she said she was "ready, willing and able" to work. ALJ Barone did *not* take that as an admission Hartnett could do "any type of substantial gainful activity" (Mem. 1). Rather he concluded Hartnett's statement was an admission she "does not regard herself as unable to engage in 'any substantial gain-

> respects, the flaws are harmless to Hartnett. To the extent, if any, Finding 10 warps application of the Grid's factors, it could only narrow the potential of transferability and thus increase the chances of finding Hartnett disabled.

9. That position is of a piece with Hartnett's assertion (advanced persistently if irrelevantly) that she has filed a complaint with the Illinois Human Rights Commission alleging National Can discriminated against her by failing reasonably to accommodate her physical limitations (R. 44–46).

ful activity' " (R. 22). In other words, the ALJ recognized Hartnett does not regard herself as *totally* disabled—as indeed it appears she does not.

True enough, a claimant's self-characterization is not determinative of her entitlement to disability benefits. She may have the best will in the world to work, yet still fall within the benefit guidelines. But the ALJ did not rely on the unemployment-application evidence to prove Hartnett could do any and all work. He merely used it as one piece of evidence tending to show Hartnett's assertion of pain, though "somewhat credible," was "not totally consistent" with her description of her daily activities (R. 24).[10] There is no error here.

### 3. Use of the Grid

■ Hartnett's third assertion has some merit but does not ultimately help her cause. ALJ Barone's application of his factual findings to the Grid was wrong: He found (R. 24) Hartnett had the residual functional capacity to perform "virtually the full range of light work (20 CFR 404.-1567)" and consequently used the "light work" Grid (Grid Table No. 2). But the predicate for use of that Grid is the ability to do "a full range of light work" (Grid § 202.00). "Virtually" a full range is not good enough. Specifically, "light work" as defined in Reg. § 1567(b) includes the ability to lift weights up to 20 pounds. But the ALJ's apparent basis for finding Hartnett could do "virtually" the full range of light work was Dr. Soriano's limitation of her lifting to 15 pounds in his most recent report (R. 220).

It was thus erroneous to look to Grid Table No. 2 ("light" work) rather than Table No. 1 ("sedentary" work).[11] But as Hartnett then points out (Mem. 12–13):

> However, assuming that claimant has transferable skills, § 201.11 of Table 1 (sedentary RFC) of the Grid mandates a finding of "not disabled." That would seem to end claimant's case.

Whether or not Hartnett's skills were properly deemed "transferable" is therefore crucial at this stage, for Table No. 1 would yield a finding of "disabled" under Grid § 201.10 if her skills were not transferable. But although there may be some fault in the form of the ALJ's finding on that score (see n. 8),[12] Hartnett does not now dispute that finding.

What she challenges instead is the ALJ's use of the Grid at all when evidence was

---

**10.** Hartnett cites this Court's opinion in *Lundquist v. Heckler,* No. 84 C 8955, slip op. at 8–10 (N.D.Ill. Sept. 4, 1985) to urge the ALJ's dismissal of her allegations of pain was overly cavalier. But here the ALJ gave reasons for his finding—including Hartnett's regular attendance at vocational classes and her ability to do her own housework and shopping—and did not rely solely (or even principally) on "sit and squirm" findings. See *Lundquist,* slip op. at 9. He might also have mentioned Hartnett's statement in her September 30, 1983 Disability Report (R. 122) that she was trying to learn ballroom dancing as a hobby. Further, the medical evidence of record (mainly that of Hartnett's own treating physician), far from contradicting the ALJ's finding, consistently emphasizes Hartnett's ability to *work*—albeit within exertional limitations decreasing over time (R. 197, 213, 214, 216, 220–21). Contrast *Lundquist,* slip op. at 8–9.

**11.** "Sedentary" work involves the lifting of weights up to 10 pounds (Reg. § 1567(a) ). Dr. Soriano's 15–pound limit for Hartnett thus satisfies the "sedentary" limit but not that for "light" work—a fact Hartnett's attorney noted at the Hearing (R. 46):

> The—the difficulty in this case is that the doctor, Doctor S[o]riano, her treating physician, has placed a weight limitation on her of either 10 or 15 pounds, which is kind of—I'm not sure if he's aware of the Social Security standards with respect to light. But it seems to indicate that he thinks that she cannot lift 20 pounds frequently and I don't know if he's thought about that to a great deal.

**12.** It is also odd that the ALJ, after having found Hartnett "not disabled" based on the transferability of her skills (R. 24, finding 11), went on to find "alternatively" she would not be deemed disabled according to the Grid even if her skills were not transferable (*id.,* finding 12). That might be taken to indicate the ALJ entertained some doubt as to transferability. But it appears from the text of the ALJ's opinion he made that arguendo finding in response to Dr. Geist's reservation about the number of job openings available to quality-control personnel with low seniority, not in response to the question of transferability per se (see R. 23). As this opinion later reflects, Dr. Geist's reservation is irrelevant to Hartnett's claim.

also taken from a vocational expert. She argues it is inappropriate to use the Grid in that case because a vocational expert's evidence is "preferred." See *Cowart v. Schweiker,* 662 F.2d 731, 736 (11th Cir. 1981).[13]

■ This Court need not decide that question. Even were Hartnett's proposition accepted arguendo, Dr. Geist's evidence also supports the conclusion Hartnett is not disabled. ALJ Barone described Hartnett's past work and present physical limitations to Dr. Geist in terms precisely corresponding to those used by Hartnett and her doctor. In particular, the ALJ told Dr. Geist to assume Hartnett could not lift more than 15 pounds on the job, avoiding any possible confusion from the use of terms such as "light" and "sedentary." Dr. Geist then listed no less than six jobs in six different industries for which Hartnett was qualified and suited.[14] That would meet even the arguably over-strict *Cowart* standard.

### 4. "Ambiguity" of the Vocational Expert's Findings

■ Finally Hartnett claims Dr. Geist's finding as to the transferability of Hartnett's skills was ambiguous, in light of the expert's qualifying statement that quality-control jobs would be hard to get without seniority (R. 224–25).[15] As this opinion has already suggested (see n. 8), that position impermissibly merges the concepts of skill-transferability and job-availability. *Skills*

are "transferable" when the nature of the task performed, tools used and materials involved resembles that of other jobs (Reg. § 1568(d)(2) ). Relevant to that finding would be the number of job categories available, but not the absolute number of jobs open to the claimant on the market.

When in doubt, it is always best to return to the law.[16] Here that requires Secretary to show Hartnett cannot do "any other kind of substantial gainful work which exists in the national economy" (Section 423(d)(2)(A) ). Arguably it is a Catch-22 to say to Hartnett:

> Many jobs exist for which you are qualified, but in fact you would never get those jobs.

Yet that is precisely what the statute says: Secretary is not required to consider "whether a specific job vacancy exists for [a claimant] or whether [she] would be hired if [she] applied for work" (*id.*). And see Reg. § 1566(c)(3):

> We will determine that you are not disabled if your residual functional capacity and vocational abilities make it possible for you to do work which exists in the national economy, but you remain unemployed because of . . . [t]he hiring practices of employers. . . .

See *Wright v. Gardner,* 403 F.2d 646, 647 (7th Cir.1968) (per curiam) (claimant is not disabled merely because he would not actually be hired for work he can perform).

We might well wonder what point there is in determining a claimant has the ability

---

**13.** *Cowart,* decided just at the time the Grid was promulgated by Secretary, took a dim view of the Grid's probative value. 662 F.2d at 736 n. 1. In view of later authority from our Court of Appeals upholding use of the Grid to meet Secretary's burden of showing the existence of significant numbers of jobs a claimant can do (see, e.g., *Smith,* 735 F.2d at 270), any support by *Cowart* for Hartnett's position is seriously undercut.

**14.** See Appendix.

**15.** Secretary Mem. 4 n. 2 faults Hartnett's lawyer for not taking advantage of "the opportunity to cross-examine the vocational expert" to eliminate what is now challenged as "ambiguous." That notion is bizarre at best—when practicing

law, this Court found cross-examination of a piece of paper extraordinarily difficult (and see *Tom,* 779 F.2d at 1252 n. 2). In light of this opinion's conclusion, however, this Court need not resolve that conundrum or decide whether the burden of any "ambiguity" would fall on Hartnett or Secretary.

**16.** Lest this Court be mistaken by taking that statement literally, it may be well to acknowledge its ironic intent. Too often in this (and other) areas, courts tend to get lost in a conceptual sea without thinking to look to the map provided by the statute being applied. When they do resort to the latter, the frequent result is that they find themselves praised or condemned (depending on the observer's perspective) as "strict constructionists" or "excessively literal."

to do work for which there are no job openings. But as *Lopez Lopez v. Secretary of HEW*, 512 F.2d 1155, 1157 (1st Cir.1975) (citations omitted, emphasis in original) teaches:

> As this court has previously stated, the statutory scheme is not an "ancillary unemployment compensation device".... It is not necessary that the Secretary demonstrate that a particular claimant would actually be hired, or even that there is a realistic chance of his being so. It is sufficient that he show that there are specific jobs in the national economy which a claimant is *capable* of performing. "Disability" as provided in the Act, although defined by reference to concepts similar to employability, is actually a term of art looking to the physical and mental capacity to engage in certain activities, regardless of whether the opportunity for any such activity actually exists.

Dr. Geist's statement that Hartnett would have a "difficult" time getting a quality-control job because she lacked seniority thus does not undercut the finding that there are significant numbers of jobs in the national economy Hartnett could do. There is no ambiguity—and no lack of validity—in such a finding. Cases cited by Hartnett as purportedly to the contrary are beside the point.[17]

Hartnett's final assault on the vocational expert's evidence focuses on her age. If placement would be difficult, she says, then by the time she adjusted to new job requirements she would be of "advanced age"—55 or over (Reg. § 1563(d) ). Transferability of skills in persons of advanced age is considered rather restricted under the Grid (*id.*). In essence Hartnett argues if it would take two years actually to get a job, she should be considered now as if she were over 55 (see Oct. 12, 1984 letter from Hartnett's attorney to ALJ Barone, R. 239).

That argument would have appeal only if the prior one were valid. If Hartnett's ability actually to obtain employment is irrelevant to a disability determination, the fact it might take her two years to get a job is a factor this Court cannot consider. Secretary must take this claimant as she finds her.[18]

### Conclusion

Secretary's decision to deny Hartnett disability benefits is supported by substantial evidence and is correct as a matter of law. Secretary's motion for summary judgment therefore is granted and Hartnett's is denied. This action is dismissed.

### Appendix

As with the ALJ's mistaken use of Grid Table No. 2, Dr. Geist's listing of jobs available to Hartnett posed some problems

---

17. For example, in *Smith v. Secretary of HHS,* [1983 Transfer Binder] Unempl.Ins.Rep. (CCH) ¶ 14,704 (D.S.C.1982) the issue was the number of job positions available capable of being performed by the claimant, not the number of job openings. In *Maynard v. Schweiker,* [1982–83 Transfer Binder] Unempl.Ins.Rep. (CCH) ¶ 14,263 (E.D.Cal.1982) the issue was whether intelligence, interest level and other personality factors were "skills" at all within the meaning of the regulations, not whether they were transferable to a significant number of jobs. It is worth observing this case does not present the problem discussed so trenchantly in *Atkins v. Califano,* 446 F.Supp. 1017, 1022 (N.D.Ill.1978) (footnote omitted):

> We are cognizant that many courts give a literal reading to the language of ... 42 U.S.C. § 423(d) and do not require either any showing by the government that any appropriate job exists which would be suitable for a claim-

ant in his own locality or that there be any vacancies for which he might conceivably qualify. This Court cannot subscribe to such a rigid view which deals only with theoretical abstractions and ignores the realistic impact which such decisions have on individual claimants in quite specific locations.

*Atkins* properly emphasized Secretary must consider a claimant's employability in light of his or her whole personal situation. But general job-market conditions are not a part of a claimant's *personal* situation. It could hardly be clearer from the text of the statute that the existence of job vacancies for a particular claimant is not a factor Secretary must consider.

18. It should be observed that even if Hartnett were considered in the "advanced age" category and capable of doing only sedentary work, Grid Table No. 1 would direct a result of "not disabled" (Grid § 201.03).

of characterization. But just as with the ALJ's error, Dr. Geist's does not ultimately help Hartnett's case.

Thus it is true Dr. Geist labelled all but one of the six jobs "light" (see n. 4). It is also true Selected Characteristics of Occupations Defined in the Dictionary of Occupational Titles (1981 ed.) ("SCOD–DOT") puts *all* the job titles listed by Dr. Geist in the "light" category (*id.* at 83, 143, 144, 233), although in three of the six cases the titles used by Dr. Geist do not correspond precisely with SCOD–DOT's usage: "Quality-Control Coordinator" (drug preparation) is called "Quality-Control Clerk" (*id.* at 233), "Quality-Control Inspector" (garment) is called "Quality-Control Checker" (*id.* at 144) and "Quality-Control Clerk" (bakery products) is called "Quality-Control Inspector" (*id.* at 143). That may suggest carelessness on Dr. Geist's part and error on the ALJ's. Where an ALJ relies on a vocational expert who has listed jobs as suitable for a claimant that SCOD–DOT puts beyond the claimant's exertional capability, there is reversible error. *Tom*, 779 F.2d at 1255–56.

But in *Tom* the ALJ had told the vocational expert to assume Tom was capable of "no more than sedentary work" (*id.* at 1255). Here ALJ Barone told Dr. Geist to assume Hartnett was limited to lifting 15 pounds, and Hartnett has made no suggestion Dr. Geist ignored that limit. Categories embodying a range of limits are useful for generalizing, but specific underlying measurements are more trustworthy. According to the Grid's rules, a job requiring lifting of 15–pound weights would indeed be classified as "light," yet Hartnett would be able to perform it. Even if, for purposes of applying the Grid, the ALJ should have used Table No. 1 ("sedentary"), that does not mean, where the more particularized information of a vocational expert is used, judgments as to a claimant's ability to perform jobs falling within the boundaries of the next-highest category cannot be accepted by the ALJ. Only government bureaucracy divides the job world into watertight compartments of "sedentary," "light," "medium" and "heavy." Employ-

ers do not. And employers surely do not reshape the real world requirements of their jobs to fit those categories precisely.

In any event, Hartnett's own argument against use of the Grid in her case is based on the presumption that a vocational expert's evidence is more accurately fitted to a particular claimant's case than the categorizations embodied in the Grid. And on that premise (necessary to Hartnett's effort to escape the "not disabled" conclusion prescribed by the Grid) she is hoist by her own petard.